USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  6/23/21

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GREGORY MARTINEZ,

           Plaintiff,

    -against-

ANDREW SAUL, Commissioner of Social
Security,

           Defendant.

19-CV-6515 (BCM)

**OPINION AND ORDER**

**BARBARA MOSES, United States Magistrate Judge.**

Plaintiff Gregory Martinez filed this action pursuant to § 205(g) of the Social Security Act
(the Act), 42 U.S.C. § 405(g), seeking judicial review of a final determination of the Commissioner
of Social Security (the Commissioner) denying plaintiff's application for Disability Insurance
Benefits (DIB) for the period September 18, 1984 through October 31, 1996. The parties consented
to the disposition of this case by the assigned magistrate judge pursuant to 28 U.S.C. § 636(c) (Dkt.
No. 11) and cross-moved for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c).

The parties agree that Administrative Law Judge (ALJ) Joani Sedaca, who denied
plaintiff's application on March 13, 2019, "erred at step five" because the "vague testimony" of
vocational expert (VE) Helene J. Feldman at the underlying hearing did not furnish substantial
evidence as to the number of jobs available in the national economy for an individual with
plaintiff's sub-sedentary residual functional capacity (RFC). *See* Pl. Mem. (Dkt. No. 24) at 21-23;
Def. Mem. (Dkt. No. 31) at 6.  However, the parties disagree as to whether the Court should remand
solely for calculation of benefits, as plaintiff urges, *see* Pl. Mem. at 23-24, or for further
administrative proceedings, as argued by the Commissioner. *See* Def. Mem. at 6-10. For the
reasons that follow, the Court concludes that the case should be remanded for further proceedings,
and that those proceedings must take place within 120 days. Consequently, defendant's motion
(Dkt. No. 30) will be granted, while plaintiff's motion (Dkt. No. 22) will be granted only in part.

# I. BACKGROUND

## A. Personal Background

Plaintiff was born on March 5, 1962. On September 18, 1984, when he was 22 years old, he was hit by a van while riding his bicycle, causing injuries to his lumbosacral spine and right knee. *See* Certified Administrative Record (Dkt. No. 14) (hereinafter "R. __") at 688. Before the accident, plaintiff attended some college and worked as a security guard and a part-time garbage disposal worker. (R. 126, 177.) He has not worked since September 18, 1984. (R. 126.)

## B. Procedural Background

This action has a lengthy and complicated procedural history, summarized here as briefly as possible.

### 1. 1984 Application

On October 17, 1984, plaintiff filed his first application for DIB, and possibly for supplemental security income (SSI) (the 1984 Application), alleging disability since September 18, 1984. (R. 181-82.)[1] No benefits were awarded.

### 2. 1994 SSI Application

Ten years later, on October 17, 1994, plaintiff filed an application for SSI only (the 1994 SSI Application), alleging disability since September 24, 1984 due to "back and knee injuries" and

---

[1] The application itself appears to have been lost to time. As Judge Pitman of this Court noted during an earlier chapter of the dispute between plaintiff and the Commissioner, the record that remains is "unclear as to whether plaintiff's 1984 application sought both DIB under Title II of the Act and supplemental security income ('SSI') benefits under Title XVI of the Act or just DIB benefits." *Martinez v. Colvin*, 2016 WL 11483844, at *7 (S.D.N.Y. Aug. 22, 2016), *report and recommendation adopted,* 2016 WL 5338554 (S.D.N.Y. Sept. 23, 2016). The record is also "unclear as to the disposition of this application." *Id*. However, as Judge Pitman observed, at least two documents in the current agency record indicate that the application was denied on December 17, 1984 under code "N31" (R. 193, 437), meaning that plaintiff could return to his past relevant work. *Martinez v. Colvin*, 2016 WL 11483844, at *7. It is not clear whether a written notice of that denial was ever issued to plaintiff. *Id*.

"mild heart attacks" after having been "hit by a van." (R. 185, 469, 656-59.) After the Social Security Administration (SSA) denied that application (R. 660-63), plaintiff requested reconsideration, and after the SSA denied reconsideration, he requested a hearing before an Administrative Law Judge (ALJ). (R. 666-72.) In a written decision dated April 16, 1996 (the April 1996 Decision), ALJ Herbert M. Frenkel denied plaintiff's 1994 SSI Application, concluding that he was not disabled within the meaning of the Act. (R. 82-89.)

### 3.    1996 SSI Application

On November 21, 1996, plaintiff filed a second application, also for SSI only (the 1996 SSI Application) (R. 91-92, 171-73, 216-46), alleging disability since September 18, 1984. (R. 171, 243.) The SSA again denied plaintiff's application. (R. 91-97.) After the agency denied reconsideration (R. 98, 100-05, 247-54), plaintiff appeared and testified at an administrative hearing before ALJ Newton Greenberg. (R. 123-37.) In a decision dated March 17, 1998 (the March 1998 Decision), ALJ Greenberg denied plaintiff's 1996 SSI Application, concluding that he was not disabled within the meaning of the Act. (R. 111-16.)

After the Appeals Council denied appellate review, plaintiff sought judicial review. In that action, docketed as *Martinez v. Apfel*, No. 00-CV-4185-LTS (S.D.N.Y.), the parties stipulated to remand before they submitted any briefing. (R. 141-42.) On remand, the Appeals Council then vacated the March 1998 Decision and directed the ALJ to "develop the record further; to weigh treating physician evidence and opinion; and to evaluate further and articulate . . . the basis for the claimant's residual functional capacity." (R. 143-45.) In a decision dated December 28, 2001 (the December 2001 Decision), ALJ Greenberg reversed course and found that plaintiff was disabled, within the meaning of the Act, and had been since November 21, 1996. (R. 62-66.)

### 4.    2004 DIB Application

On October 6, 2004, plaintiff filed a second application for DIB (the 2004 DIB Application), asserting disability since October 17, 1984. (R. 174-76.) After the agency denied his claim, plaintiff submitted a request for a hearing. (R. 158A-62.) By order dated November 17, 2005, ALJ Robin J. Arzt dismissed plaintiff's request for a hearing on the basis of *res judicata* (R. 57-58), but the Appeals Council remanded the case (R. 45-47), holding that *res judicata* did not apply because the relevant musculoskeletal listings had been revised and "the standard for review is no longer the same." (R. 46.) On August 28, 2007, when plaintiff appeared and testified again before ALJ Arzt, he orally amended his alleged disability onset date to September 18, 1984, the date of the accident. (R. 30.) In a decision dated August 30, 2007 (the August 2007 Decision), ALJ Arzt concluded that plaintiff's date last insured (DLI) was December 31, 1986, but that he was not disabled, within the meaning of the Act, from September 18, 1984 through that date. (R. 30-38.)

Plaintiff again sought judicial review. In that action, docketed as *Martinez v. Astrue*, No. 09-CV-9451-NRB (S.D.N.Y.), the parties again stipulated to remand prior to briefing. (R. 1021-22.) In an order dated December 22, 2010, the Appeals Council vacated the August 2007 Decision and directed the ALJ to re-evaluate the medical opinion evidence, reconsider plaintiff's RFC "during the entire period at issue," and "[o]btain evidence from a vocational expert," among other things. (R. 1018-20.) In addition, the Appeals Council directed that another ALJ be assigned "as the case has already been twice before" ALJ Greenberg. (R. 1020.)

On March 29, 2011, plaintiff appeared and testified before ALJ Mark Solomon. (R. 1033-60.) VE Steven Feinstein also testified. (*Id.*) In a decision dated April 29, 2011 (the April 2011 Decision), ALJ Solomon concluded that plaintiff's DLI was December 31, 1989 (having been

"revised due to the Steinberger [sic] litigation," R. 992),[2] but that plaintiff was not disabled, within the meaning of the Act, between October 17, 1984 and December 31, 1989. (R. 987-97.)

Plaintiff then sought judicial review for a third time. That action was docketed as *Martinez v. Astrue*, No. 11-CV-6013-RA-HBP (S.D.N.Y.) (hereafter *Martinez 2011*). For a third time, the parties agreed to remand before any briefs were submitted. Stipulation and Order of Remand, *Martinez 2011*, ECF No. 16 (Aug. 7, 2012). In an order dated November 17, 2012, the Appeals Council vacated the April 2011 decision, this time directing the ALJ to: (1) clarify plaintiff's date last insured; (2) determine whether his 1984 Application "is ripe for adjudication," having never been decided, or, alternatively, "whether this application qualifies the claimant for relief under the Stieberger class action settlement"; (3) "reassess whether a left knee disorder and cervical spine pain qualify as medically determinable impairments"; (4) "give further consideration to the treating source opinion of Dr. [William] Kulak"; (5) "give further consideration to the claimant's maximum residual functional capacity"; and (6) "obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base." (R. 1092-98.) On

---

[2] In *Stieberger v. Bowen*, 792 F. Supp. 1376, *modified*, 801 F. Supp. 1079 (S.D.N.Y. 1992), the plaintiffs alleged that the Secretary of Health and Human Services "failed to require SSA adjudicators to apply binding interpretations of law issued by the Court of Appeals to claims of New York State residents for disability benefits under Titles II and XVI of the Social Security Act." *Hairston v. Commissioner of Social Security*, 2004 WL 253288, at *1 (S.D.N.Y. Feb. 10, 2004). The settlement agreement, approved by the court, created procedures for SSA adjudicators to follow in the future, while also "rectify[ing] past misapplications of law" by reopening and re-adjudicating cases that met certain criteria, *see id.*, including that the individual must have had a disability claim denied or terminated between October 1, 1981 and July 2, 1992. *See Stieberger*, 801 F. Supp. at 1086 (¶ 8). In this case, the record shows that plaintiff completed a "Stieberger Supplement" on October 6, 2000. (R.592-92.) Thereafter, on December 19, 2000, SSA medical consultant E. Schulman reviewed plaintiff's file for the period from May 1989 to December 19, 2000, apparently for purposes of "Stieberger." (R. 648-55). It is not clear from the record before this Court why that review covered the 17-month time period specified. Nor is it clear why ALJ Solomon concluded in April 2011 that plaintiff's DLI was "revised" to December 31, 1989, as a result of *Stieberger*.

April 17, 2013, plaintiff appeared and testified again before ALJ Solomon. (R. 1122-47.) VE Gerald Belcheck also testified. (*Id.*) In a decision dated May 13, 2013 (the May 2013 Decision) (R. 1070-78), ALJ Solomon denied plaintiff's claim because "he would not be a class member under *Stieberger*." (R. 1071.) Specifically, ALJ Solomon found that although plaintiff filed his 1984 Application in 1984, it "was not considered received until October 6, 2004," which in turn meant that "there was no final denial or ALJ action on claimant's application within the necessary time frames to qualify claimant as a *Stieberger* class member." (*Id.*) The ALJ went on to conclude that plaintiff was not disabled, within the meaning of the Act, from October 17, 1984 through December 31, 1986, "nor through the previously considered date last insured of December 31, 1986." (R. 1077.)

Although plaintiff submitted exceptions to the May 2013 Decision (R. 1065-66), the Appeals Council "found no reason under [our] rules to assume jurisdiction" because, in its view, the ALJ's decision was "supported by substantial evidence" and "complie[d] with the district court order and the Appeals Council remand order." (R. 1061-64.) Plaintiff then sought judicial review for a fourth time. During the course of that litigation – referred to Judge Pitman – counsel for the Commissioner came to the conclusion that "defense of this matter [is] unworkable," and offered plaintiff a "remand for the purposes of calculating plaintiff's benefits." Def. Ltr., *Martinez v. Colvin*, No. 15-CV-3366-PGG-HBP (S.D.N.Y.) (hereafter *Martinez 2015*), ECF No. 24 (June 22, 2015), at 1. After plaintiff declined the offer, the Commissioner filed a cross-motion to remand for the purpose of calculating plaintiff's benefits "as of November 21, 1996," and possibly for earlier periods. Def. Mem., *Martinez 2015*, ECF No. 27 (June 24, 2016), at 5. In his responding brief, plaintiff noted that he was already receiving SSI benefits calculated from the same date and argued that "the relief offered [by the Commissioner] is incomplete and is not responsive to the actual

issues before the Court." Pl. Mem., *Martinez 2015*, ECF No. 29 (July 29, 2016), at 1. Plaintiff sought a judicial finding that he was disabled and entitled to DIB as of "October 17, 1984," or, in the alternative, a remand for the re-adjudication of "his 1984 claim." *Id*. at 3.

On August 22, 2016, Judge Gardephe – acting on Judge Pitman's recommendation – held that ALJ Solomon's determination that plaintiff was not a member of the *Stieberger* class was not supported by substantial evidence, and remanded for "additional factual development" of that issue and for "a determination as to the disability onset date." *Martinez v. Colvin*, 2016 WL 5338554, at *2-3 (S.D.N.Y. Sept. 23, 2016). No specific time limit was placed on the Commissioner.

On remand, the Appeals Council vacated the May 2013 Decision (*see* R. 1151), and on December 12, 2018, plaintiff, represented by counsel, appeared and testified before ALJ Sedaca. (R. 1166-242.) VE Feldman also testified. (*Id*.) In a decision dated March 13, 2019 (March 2019 Decision) (R. 1151-65), ALJ Sedaca concluded that plaintiff's 1984 Application was in fact denied on December 17, 1984, making him a member of the *Stieberger* class (R. 1152); that his date last insured was December 31, 1986 (R. 1154); but that he was not disabled, within the meaning of the Act, at any time from September 18, 1984 through October 31, 1996, and therefore was not entitled to either DIB or SSI benefits for any portion of the period under review. (R. 1165.)[3]

It is the March 2019 Decision that is now at issue.

---

[3] ALJ Sedaca explained that since plaintiff had unsuccessfully applied for SSI as well as DIB from 1984 forward, and had already "established eligibility for SSI benefits at all time[s] since December 1996" (R. 1152), she would consider plaintiff's eligibility for DIB from the alleged onset date through December 31, 1986 (his DLI) and would also consider plaintiff's eligibility for SSI "any time prior to November 1996." (R. 1152, 1165.)

## II.     MEDICAL EVIDENCE

Plaintiff does not contend that ALJ Sedaca committed any error in connection with steps one through four of her analysis. Nor does he object to the ALJ's formulation of his RFC: that during the period under review he had "the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except he can occasionally climb, stoop, and crouch; no kneeling, balancing, or crawling; and, must use a cane when walking." (R. 1155.)[4] Consequently, rather than recite plaintiff's medical history in detail,[5] we briefly summarize that history only for the years 1984 through 1996.

### A.     Medical Records

On September 18, 1984, as noted above, plaintiff was hit by a van while riding a bicycle. Thereafter, the record indicates that he was hit by a taxi while crossing the street in 1986 (*see*, *e.g.*, R. 133); he was hit on the head by an object during a mugging in 1992 (*see* R. 316); and he was injured at a jazz festival in 1996 when another person fell on him. (*See* R. 355.)

Immediately after the September 18, 1984 bike accident, plaintiff was taken to St. Vincent's Hospital, where he was treated and discharged. (R. 688.) He was then admitted to North General Hospital "for observation, bed rest, pelvic traction and physical therapy to the right knee and the lumbosacral spine," where he remained from September 20 through October 4, 1984. (R. 688-89.) Beginning on September 20, 1984, plaintiff regularly visited William Kulak, M.D., an orthopedic surgeon. Dr. Kulak's examinations revealed "a persistent amount of pain over the patella femoral

---

[4] Sedentary work "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. §§ 404.1567(a), 416.967(a).

[5] The detail may be found in *Martinez v. Colvin*, 2016 WL 11483844, at *2-7.

surface of the right knee," and "[o]ver the next several months . . . quadriceps wasting on the right lower extremity, due to the knee pathology." (R. 689.)

On February 1, 1985, plaintiff underwent arthroscopic surgery on the right knee (R. 690, 694-95), after which he began "an intensive program of physical therapy, and showed slow improvement" in the knee. (R. 690.) On May 6, 1985, Dr. Kulak wrote that plaintiff had "mild tenderness" in the patella, but was improving (R. 684), and although as yet "unable to return to full activities," he could potentially return to work "within 4 – 6 wks." (*Id.*) On September 29, 1986, Dr. Kulak observed that plaintiff had spasms in his left and right lumbosacral area, as well as tenderness along the left and right trapezius with mild spasm. (R. 685.) Several years later, on January 25, 1989, Dr. Kulak observed increased pain on the right side of plaintiff's lower back and cervical spine. (R. 685.) He then prescribed a soft cervical collar. (*Id.*)

On June 13, 1990, an internist at William F. Ryan Community Health Center (Ryan Center) noted that plaintiff complained of pain in his lower back and legs and observed that plaintiff was wearing a back brace. (R. 302.) Plaintiff visited the Ryan Center sporadically to treat his lower back pain (and other issues) for several years afterward. (R. 324-29.) A July 1995 CT scan of plaintiff's lumbar and sacral spine showed a "bulging annulus . . . at L5-S1, with extrusion inferiorly," but "no compression of either nerve roots or the thecal sac." (R. 401.)

### B. Opinion Evidence

On April 27, 1985, Dr. Kulak opined that plaintiff "is unable to sit for extended periods of time and is unable to bend or lift loads greater than 5 to 10 lbs," which would "definitely interfere with [plaintiff's] occupation as a Security Guard." (R. 691.) He concluded that plaintiff had a "definite partial disability" as to his right knee and the lumbosacral spine. (*Id.*)

In May 1985, a single-page, unsigned sheet was completed, stating that plaintiff should avoid climbing but could walk and stand to a "limited extent." (R. 692.) A box was checked off

indicating that plaintiff was "not capable of working in any capacity at this time," but that he would be able to work "in about 6 wks." (*Id.*)

On August 1 and October 16, 1996, Theresa Mack, M.D., who had been treating plaintiff at the Ryan Center, wrote two short letters[6] opining that he was "unable to work" at this time. (R. 546.) Dr. Mack reported that after the 1984 car accident that injured his neck and lower back plaintiff continued to experience "chronic pain." (*Id.*) Moreover, he was diagnosed in 1986 "with a herniated disc in the lower back that persists today." (*Id.*)

On November 14, 1994, Peter E. Graham, M.D. completed a consultative examination, after which he reported that there was "minimal functional deficit present" and that plaintiff was "able to sit, stand, walk, lift, carry, handle objects, hear, speak and travel." (R. 480.) Dr. Graham conducted another consultative examination on December 11, 1996, again concluding that plaintiff's neck and back pain did not cause any "functional deficit." (R. 550.) Dr. Graham again concluded that plaintiff was "able to sit, stand, walk, lift, carry, handle objects, hear, speak, and travel." (*Id.*)

## III.   HEARING

At plaintiff's hearing before ALJ Sedaca, he testified that he was hit by a van and hospitalized on September 18, 1984. (R. 1205-06.) At the time of the accident, plaintiff had been working as a security guard, but he did not return to that job – or any job – after the accident. (R. 1206-07.) Plaintiff explained that he did not return to work "mainly" due to his back injury, for which he received injections, physical therapy, and medication, which helped. (R. 1217-18.) He further testified that his back injury affected his mood and his family. (R. 1218.)

---

[6] The content of the letters are identical, but the August 1 letter is handwritten, whereas the October 16 letter is typewritten.

The ALJ then took testimony from VE Feldman, who stated that plaintiff's most recent prior work was as a security guard, DOT code 372.667-034, performed at the "light" exertional level. (R. 1212.) The ALJ then presented VE Feldman with a hypothetical claimant of plaintiff's age, education, and work experience, who could perform sedentary work with the following additional limitations: "can occasionally climb, stoop, crouch with no kneeling, no balancing or crawling." (R. 1212-13.) VE Feldman testified that although such a hypothetical claimant could not perform plaintiff's past work, there were jobs that such a claimant was capable of performing, including dowel inspector, DOT code 669.687-014; dial marker, DOT code 729.684-018; order clerk, DOT code 209.567-014; and document preparer, DOT code 249.587-018. (R. 1213-16.) However, VE Feldman noted that she could not say "with any certainty" how many of each of those jobs existed "in the '80s." (R. 1214.) Although she thought the Department of Labor likely kept the relevant statistical data, it was not available on her computer at the time of the hearing. (R. 1214-15.) Instead, VE Feldman offered "up-to-date" figures. (R.1215.) She testified that, at present, the "national figure" for dowel inspector was 509,000 dowel inspector jobs; for dial markers, 16,000 jobs; for order clerks, 177,000 jobs; and for document preparers, 3 million jobs. (R. 1215-16.)

The ALJ then posed a second hypothetical to VE Feldman, identical to the first with one additional limitation: "the individual had unscheduled absences more than one time per month." (R. 1216.) VE Feldman responded that "[t]here would, more than likely, be no sustainable employment available." (*Id.*) The ALJ then posed a third hypothetical, presenting the following additional limitation: "the individual needed unscheduled breaks more than 10 percent of the time." (*Id.*) Again, VE Feldman responded that "more than likely," there would be "no sustainable

employment." (*Id.*) Later, when the ALJ asked, "what if the individual was off task more than 5 percent of the time?" the VE repeated, "There would be no sustainable employment." (R. 1232.)

During cross-examination by plaintiff's counsel, VE Feldman testified that the numbers she had provided for each of the jobs she identified were actually "industry national figure[s]," drawn from "OES [Occupational Employment Statistics] data," that corresponded to clusters of aligned jobs grouped together by the Bureau of Labor Statistics. (R. 1233-34.) Within that grouping, there were jobs unsuitable for a hypothetical claimant limited to sedentary work with additional restrictions. For example, the VE explained, "dowel inspector" is "grouped within the title of inspectors, testers, sorters, samplers, and weighers," and within that group the exertional levels range "from sedentary to heavy." (R. 1234-35.) Thus, there were not, in reality, 509,000 dowel inspector jobs available in the national economy at the sedentary level. (R. 1236.) At no time during or after the hearing did VE Feldman provide accurate numbers (as of any time period) for each individual job she named.[7]

## IV.    THE ALJ'S DECISION

### A.    Standards

A claimant is "disabled" within the meaning of the Act if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The

---

[7] At one point, VE Feldman testified that the "individual figure" for dowel inspectors was "103," based on "SkillTRAN's Job Browser Pro's program." (R. 1229-30, 1233.) It is not clear from her testimony, however, whether the "103" dowel inspector jobs (which we presume was meant to signify 103,000 jobs) were all capable of being performed at the sedentary level with the additional limitations incorporated into the ALJ's RFC. The VE did not give "individual figures" for any of the other three positions she identified.

impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

In her March 2019 Decision, the ALJ correctly set out the five-step sequential evaluation process used pursuant to 20 C.F.R. §§ 404.1520(a) and 416.920(a) to determine whether a claimant over the age of 18 is disabled within the meaning of the Act. (R. 1153-54.) The Second Circuit has described the sequence as follows:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. Where the claimant is not, the Commissioner next considers whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment that is listed in 20 C.F.R. pt. 404, subpt. P, app. 1 . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, she has the residual functional capacity to perform her past work. Finally, if the claimant is unable to perform her past work, the burden then shifts to the Commissioner to determine whether there is other work which the claimant could perform.

*Jasinski v. Barnhart*, 341 F.3d 182, 183-84 (2d Cir. 2003).

If it is determined that the claimant is or is not disabled at any step of the evaluation process, the evaluation will not progress to the next step. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). A claimant bears the burden of proof as to the first four steps, while the Commissioner bears the burden at the fifth step. *Melville v. Apfel*, 198 F.3d 45, 51 (2d Cir. 1999); *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998). To support a finding that the claimant is not disabled at step five, the Commissioner must offer evidence demonstrating that other work exists in significant numbers in the national and local economies that the claimant can perform, given his residual functional capacity, age, education, and past relevant work experience. *See* 20 C.F.R. §§ 404.1560(c),

416.960(c). "Under the law of this Circuit and the SSA Guidelines, the ALJ must call a vocational expert to evaluate a claimant's significant non-exertional impairments in order to meet the step five burden." *Lacava v. Astrue*, 2012 WL 6621731, at *18 (S.D.N.Y. Nov. 27, 2012) (citations omitted), *report and recommendation adopted*, 2012 WL 6621722 (S.D.N.Y. Dec. 19, 2012).

Prior to steps four and five, the ALJ must determine the claimant's RFC, that is, the "most [a claimant] can still do despite [his] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The claimant's RFC is determined based on all of the relevant medical and other evidence in the record, including the claimant's subjective testimony, objective medical evidence, and medical opinions from treating and consulting sources. 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3).

## B.    Application of Standards

At step one, the ALJ found that plaintiff had not "engaged in substantial gainful activity since September 18, 1984, the alleged onset date." (R. 1154.) She further noted that "[t]he period at issue ends on October 31, 1996 based on a previous finding" – that is, the December 2001 Decision – "that the claimant has been disabled since November 1996." (*Id.*)

At step two, the ALJ found that plaintiff had the severe impairments of "right knee degenerative joint disease . . . and, degenerative joint disease of the lumbar spine with evidence of disc bulging." (R. 1154.)

At step three, the ALJ found that plaintiff did "not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments" in 20 CFR §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926. (R. 1155.)

Before proceeding to step four, the ALJ determined that plaintiff had the RFC "to perform sedentary work . . . except he can occasionally climb, stoop, and crouch; no kneeling, balancing, or crawling; and, must use a cane when walking." (R. 1155.)

In determining plaintiff's RFC, the ALJ found that plaintiff's "impairments could reasonably be expected to cause the alleged symptoms," but that his "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record[.]" (R. 1156.) In support of this finding, the ALJ summarized the medical evidence in the record, emphasizing that plaintiff was able "to perform a wide range of sedentary work during the period prior to November 1, 1996"; that although he testified to using a cane, much of the objective medical evidence did not indicate that he required an assistive device; that after the 1984 accident plaintiff "suffered traumatic injuries in July 1996 . . . and April 1997 . . . which significantly worsened his musculoskeletal impairments"; that before those injuries, he was able to alleviate his pain by taking Motrin; and that "clinical studies fail to document evidence of significant pathology in the claimant's lower spine or knees which would prevent him from performing the requirements of a wide range of sedentary work" from 1984 through October 1996. (R. 1156, 1163.)

At step four, on the basis of her RFC determination, the ALJ found that plaintiff was unable to perform any past relevant work. (R. 1163.)

At step five, the ALJ found that, considering plaintiff's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that plaintiff could perform. (R. 1164.) Relying on the testimony of VE Feldman – including the "industry national figures" discussed above – the ALJ concluded that plaintiff could have been employed as a dowel inspector, dial marker, or document preparer. (*Id*.) The ALJ therefore found that plaintiff was not disabled, as defined in the Act, from September 18, 1984, through October 31, 1996. (R. 1165.)

## V.    ANALYSIS

Both parties have moved for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). To prevail on such a motion, a party must establish that no material facts are in dispute and that judgment must be granted to that party as a matter of law. *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2d Cir. 1988); *Claudio v. Comm'r of Soc. Sec.*, 2017 WL 111741, at *1 (S.D.N.Y. Jan. 11, 2017).

A reviewing court "may set aside an ALJ's decision only where it is based upon legal error or where its factual findings are not supported by substantial evidence." *McClean v. Astrue*, 650 F. Supp. 2d 223, 226 (E.D.N.Y. 2009) (citing *Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998)); *accord Longbardi v. Astrue*, 2009 WL 50140, at *21 (S.D.N.Y. Jan. 7, 2009). Thus, the district court must first decide whether the Commissioner applied the correct legal standards. *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999); *Calvello v. Barnhart*, 2008 WL 4452359, at *8 (S.D.N.Y. Apr. 29, 2008), *report and recommendation adopted*, 2008 WL 4449357 (S.D.N.Y. Oct. 1, 2008). If there was no legal error, the court must determine whether the ALJ's decision was supported by substantial evidence. *Tejada*, 167 F.3d at 773; *Calvello*, 2008 WL 4452359, at *8.

"Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). However, the reviewing court's task is limited to determining whether substantial evidence exists to support the ALJ's fact-finding; it may not reweigh that evidence or substitute its judgment for that of the ALJ where the evidence is susceptible of more than one interpretation. "[O]nce an ALJ finds facts, [the court] can reject those facts only if a reasonable factfinder would *have to conclude otherwise.*" *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (emphasis in original) (internal quotation marks and citation omitted). Thus, if the ALJ's determinations are supported

by substantial evidence, "the Court must affirm the decision of the [Commissioner] even if there is also substantial evidence for plaintiff's position." *Gernavage v. Shalala*, 882 F. Supp. 1413, 1417 n.2 (S.D.N.Y. 1995) (citing *Schauer v. Schweiker*, 675 F.2d 55, 57 (2d Cir. 1982)); *accord Johnson v. Astrue*, 563 F. Supp. 2d 444, 454 (S.D.N.Y. 2008). The substantial evidence standard is "a very deferential standard of review – even more so than the 'clearly erroneous' standard." *Brault*, 683 F.3d at 448; *see also Brown v. Colvin*, 73 F. Supp. 3d 193, 198 (S.D.N.Y. 2014).

"[T]he crucial factors in any determination must be set forth with sufficient specificity to enable [the reviewing court] to decide whether the determination is supported by substantial evidence." *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984). But if the ALJ adequately explains his reasoning, and if his conclusion is supported by substantial evidence, the district court may not reverse or remand simply because it would have come to a different decision on a *de novo* review. "Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citation and internal quotation marks omitted); *see also Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998) ("the court should not substitute its judgment for that of the Commissioner").

A.    **Plaintiff's Contentions**

In this case, plaintiff first argues that the Commissioner agreed in June and July 2016 (when the May 2013 Decision was before Judge Pitman) that plaintiff "was a *Stieberger* class member and offered to find him entitled to Title II disability benefits (DIB) based on his 2004 application for benefits," and yet, on remand, the Commissioner "never effectuated the calculation of Social Security Disability benefits owed to" him, which was in error. Pl. Mem. at 20-21. The Commissioner responds that although he *offered* to find plaintiff entitled to benefits based on his 2004 application, plaintiff *rejected* the offer, and the Court ultimately remanded for further

proceedings, not merely for calculation of benefits. Def. Mem. at 4-5. Therefore, the Commissioner argues, he fully complied with the Court's directive. *Id.* at 5.

Plaintiff next argues that ALJ Sedaca's March 2019 Decision is not supported by substantial evidence because the vocational expert's testimony was flawed and did not provide substantial evidence that a significant number of jobs existed in the national economy that plaintiff could perform. Pl. Mem. at 21-22. The Commissioner agrees. Def. Mem. at 6.

Finally, plaintiff argues that he is entitled to a remand solely for the calculation of benefits because the Commissioner "had ample opportunities to meet his step five burden on five separate occasions but failed to do [so] despite multiple and repeated hearings at plaintiff's expense." Pl. Mem. at 23. The Commissioner agrees that the case should be remanded, but only for further administrative proceedings, not for the calculation of benefits. According to the Commissioner, a remand for calculation of benefits "is unwarranted because the only issue in dispute is whether the Commissioner can show that there are significant numbers of jobs in the national economy that Plaintiff could perform," and thus, a "more complete record might support the Commissioner's decision." Def. Mem. at 6-7. Delay alone, the Commissioner argues, is not sufficient reason for directing the calculation of benefits to a claimant "whose impairment has not been determined," either by the Commissioner or by the Court, "to meet the statutory definition of disability." *Id.* at 7.

**B.      The Commissioner Complied with the Court's Order**

The Commissioner is correct that he was under no obligation to honor his pre-decisional offer in *Martinez 2015* to "remand for the purposes of calculating plaintiff's benefits." Pl. Mem. at 20. Plaintiff pointedly rejected the offer when made and opposed the Commissioner's remand motion, calling the proposal "incomplete" and "not responsive" because the Commissioner "would limit relief to payment of Social Security Disability Benefits (i.e., Title II disability benefits) as of

November 1996," by which time plaintiff had begun to collect SSI, such that "the net monetary relief for Mr. Martinez under the Commissioner's remand offer" was "likely zero." Pl. Mem., *Martinez 2015*, ECF No. 29 (July 29, 2016), at 1.

Having rejected the Commissioner's offer, the plaintiff was entitled, on remand, only to what Judge Pitman recommended – and Judge Gardephe ordered – namely, "that the matter be remanded to the Commissioner to (1) determine whether plaintiff is a *Stieberger* class member with respect to both his purported 1984 SSI application and his 1984 DIB application and (2) determine whether plaintiff was disabled for the applicable time period and, if so, his disability onset date so as to calculate the benefits defendant now concedes plaintiff is owed." *Martinez v. Colvin*, 2016 WL 11483844, at \*21. That is precisely what the ALJ did on remand: on the first question, the ALJ concluded that plaintiff was a *Stieberger* class member, but on the second question, the ALJ found plaintiff was not disabled from September 18, 1984 through October 31, 1996, and therefore, she did not calculate either DIB or SSI benefits. (R. 1165.) Consequently, the ALJ complied with the Court's order.

### C.    The ALJ's Step Five Error Requires Remand

At step five, the Commissioner is "responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy" that the claimant can do. 20 C.F.R. §§ 404.1560(c)(1)-(2), 416.960(c)(1)-(2). The Medical-Vocational Guidelines (commonly referred to as the "Grids"), 20 C.F.R. pt. 404, subpt. P, app'x 2, typically guide this evaluation, placing claimants with exertional limitations into categories according to their exertional capabilities (*e.g.*, sedentary, light, or medium work), age, education, and work experience. *See* 20 C.F.R. §§ 404.1520(g), 416.920(g). However, "[w]hen a claimant suffers from a nonexertional limitation such that he is 'unable to perform the full range of employment indicated by the [Grid],' the Commissioner must introduce the testimony of a vocational expert in order to prove 'that jobs

exist in the economy which claimant can obtain and perform.'" *Rivera v. Colvin*, 2015 WL 1027163, at *11 (S.D.N.Y. Mar. 9, 2015) (quoting *Butts v. Burnhart*, 388 F.3d 377, 383 (2d Cir. 2004), and *Bapp v. Bowen*, 802 F.2d 601, 605-06 (2d Cir. 1986)).

Here, plaintiff argues (and the Commissioner concedes) that the VE's testimony does not constitute substantial evidence as to the step five issue: whether a significant number of jobs existed in the national economy that plaintiff could perform. Not only were her figures drawn from the wrong time period; the number of jobs she provided for each of the four positions she identified confusingly "reflected total job numbers for a group of occupations," including occupations requiring work at higher exertional levels. *See* Pl. Mem. at 21; (R. 1234). Without accurate figures for jobs that could actually be performed by a claimant with plaintiff's "sub-sedentary" RFC, the ALJ erred in concluding that plaintiff was not disabled. *See Renee D. v. Comm'r of Soc. Sec.*, 2018 U.S. Dist. LEXIS 151751, at *10-12 (N.D.N.Y. Sept. 6, 2018) (remanding for further administrative proceedings where the VE "was vague as to the number of jobs" existing in the national economy that plaintiff could perform, and in particular failed to explain the difference between the "national OES" figures for the jobs described and the significantly smaller "Job Browner Pro numbers" for the same positions).

### D.  Remand Solely for the Calculation of Benefits is Not Appropriate

Under Section 205(g) of the Act, the Court has the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the case for a rehearing." 42 U.S.C. § 205(g). Where "the record provides persuasive proof of disability and a remand for further evidentiary proceedings would serve no purpose," the appropriate remedy is to remand solely "for calculation and payment of benefits." *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980). On the other hand, where there is a basis to conclude "that a more complete record might support the

Commissioner's decision," remand for calculation of benefits would not be appropriate, and the court instead should remand for further proceedings. *See Rosa v. Callahan*, 168 F.3d 72, 83 (2d Cir. 1999). "[A]bsent a finding that the claimant was actually disabled, delay alone is an insufficient basis on which to remand for benefits." *Bush v. Shalala*, 94 F.3d 40, 46 (2d Cir. 1996); *Castorina v. Saul*, 2020 WL 6688961, at *24 (S.D.N.Y. Aug. 24, 2020), *report and recommendation adopted,* 2020 WL 6781078 (S.D.N.Y. Nov. 18, 2020).

Here, there is a clear "basis to conclude that a more complete record might support the Commissioner's decision." *Rosa*, 168 F.3d at 83. All the ALJ will need is the numbers of jobs available in the relevant time period for the jobs identified by the VE. There is no contention (either by the Commissioner or the plaintiff) that those numbers are unavailable. If the Commissioner can show on remand that at least some of the identified jobs existed in significant numbers, there will be substantial evidence to support the Commissioner's decision. *See Sczepanski v. Saul*, 946 F.3d 152, 161-62 (2d Cir. 2020) (declining plaintiff's request to remand solely for the calculation of benefits because the ALJ needed to modify only one aspect of the hypothetical posed to the vocational expert, and if the Commissioner could "show on remand that even a fraction of the 3 million jobs identified by the vocational expert" would be available, "then the Commissioner may be able to show that there are significant numbers of jobs in the national economy that [plaintiff] can perform"). Moreover, the step five error at issue here was committed for the first (and only) time in 2018. All of the previous remands were caused by errors at steps one through four of the analysis. Thus, there is no reason to believe that the Commissioner cannot rectify the error now requiring remand. *Cf. Mortise v. Astrue*, 713 F. Supp. 2d 111, 128 (N.D.N.Y. 2010) (remanding for calculation of benefits where ALJ repeatedly erred in applying the treating physician rule and further development of the record would not affect the result); *Steficek v. Barnhart*, 462 F. Supp.

2d 415, 421 (W.D.N.Y. 2006) (remanding for calculation of benefits where Commissioner committed "the exact same errors the second time around").

The Court is not insensible of the almost four decades that have passed since plaintiff first sought benefits. The Court is also well aware that plaintiff has already appeared at multiple hearings, before multiple ALJs, and filed multiple court actions, each and every one of which has resulted in a remand for further administrative proceedings. It is thus appropriate to "set a time limit for action by the administrative tribunal." *Zambrano v. Califano*, 651 F.2d 842, 844 (2d Cir. 1981); *see also Butts v. Barnhart*, 416 F.3d 101, 106 (2d Cir. 2005) (imposing a 120-day time limit for proceedings to be completed before the ALJ, and 60 days for the Commissioner to act on the claimant's appeal from any unfavorable ALJ decision); *Michaels v. Colvin*, 621 F. App'x 35, 41 (2d Cir. 2015) (summary order) (same); *Cruz v. Colvin*, 2015 WL 5813158, at *4 (S.D.N.Y. Oct. 6, 2015) (imposing a 120 day time limit where, among other things, ALJ failed to call a vocational expert and the SSA first denied plaintiff's application for SSI almost six years prior). Here, as in *Butts* and *Michaels*, only step five requires adjudication on remand. Therefore, further proceedings before the ALJ must be completed within 120 days of the date of this Opinion and Order. If the decision of the ALJ is a denial of benefits, a final decision of the Commissioner must be rendered within 60 days of plaintiff's appeal from that decision. "[I]f these deadlines are not observed, a calculation of benefits" owed to plaintiff based on his alleged onset date "must be made immediately." *Michaels*, 621 F. App'x at 41 (quoting *Butts*, 416 F.3d at 106).

## VI. CONCLUSION

For the foregoing reasons, the Commissioner's motion is GRANTED; plaintiff's motion is GRANTED IN PART AND DENIED IN PART; and this action is REMANDED for further proceedings, consistent with this Opinion, which must be completed before the ALJ within 120 days of today's date, and before the Commissioner within 60 days of any appeal from the determination of the ALJ.

Dated:  New York, New York
       June 23, 2021

**SO ORDERED.**

_____
**BARBARA MOSES**
**United States Magistrate Judge**